### CASE No. 809.

### STATE, *EX RELATIONE* THE ATTORNEY-GENERAL, v. HA-GOOD.

1. When the constitution prescribes certain requisites in the enactment of a statute, the court may look behind the seal of the state, the approval of the governor and the signatures of the presiding officers of the general assembly, to ascertain whether the constitutional requirements have been complied with.
2. An act of the legislature, as ratified by the two houses and approved by the governor, is not valid unless it has had three readings on three several days in each branch of the general assembly. *Const., Art. XI.,* § 21.
3. Where a specific tax levy, without having passed the general assembly, is inserted in the enrolled copy of a bill which has passed, and the enrolled bill is ratified and approved, such levy has not the force of a law.
4. Where a bill providing for a tax levy of four and one-half mills, passes both branches of the general assembly, but the enrolled copy for ratification has the one-half changed to "three-quarters," so as to read "four and three-quarters mills," in which form it is ratified and approved—*Held,* that there was no authority to levy a tax of either four and one-half or four and three-quarters mills. McGOWAN, A. J., *dissenting.*
5. *State* v. *Platt,* 2 *S. C.* 150, doubted by McIVER, A. J.

---

This was an original application, on January 15th, 1880, by the Hon. Le Roy F. Youmans, attorney-general, for a writ of *mandamus* to compel the Hon. Johnson Hagood, comptroller-general, to proceed with the levy of taxes under the act of December 24th, 1879. 17 *Stat.* 115.

The petition set forth the following matters:

1. That on December 24th, 1879, William D. Simpson, gov-

ernor of the State of South Carolina, approved and signed an act of the general assembly of this state, entitled "An act to raise supplies and make appropriations for the fiscal year commencing 1st November, 1879," which act had had the great seal of the state affixed to it, and had been signed in the senate and house by the president of the senate and the speaker of the house of representatives.

2. That it is the duty of the comptroller-general of this state to annually notify each county auditor of the rate per centum authorized by law to be levied for the various state purposes, and to prepare and transmit to each county auditor the necessary forms and instructions to carry into effect the provisions of the tax laws, which forms and instructions are required to be obeyed by all county, town and municipal officers.

3. That although it is the official duty, by statute, of Johnson Hagood, as comptroller-general, to perform the acts hereinbefore stated, for the purpose of carrying into effect the act of Assembly in Paragraph 1, hereinbefore mentioned, yet the said Johnson Hagood has refused and still refuses so to do, unless herein directed by judicial authority.

4. That unless the said Johnson Hagood does perform the said duties of the office of comptroller-general, the entire machinery of the state for raising revenue and paying appropriations will be paralyzed, to the great and irreparable detriment of the State of South Carolina.

An order was signed requiring the said Hagood to show cause forthwith why a writ of *mandamus* should not issue as prayed for.

The return was then filed, which was as follows:

1. Johnson Hagood, comptroller-general of said state, upon whom an order of this honorable court has been served, requiring him to show cause why a writ of *mandamus* should not issue, as prayed for by the petition herein, for cause shows: That he admits that he has refused and still refuses to proceed, as comptroller-general, under the alleged act of the general assembly, entitled " An act to raise supplies and make appropriations for the fiscal year commencing 1st November, 1879 ;" rati-

fied and approved December 24th, 1879, as stated in said petition, for the following reasons :

2. That the alleged act, as ratified and approved purports to levy a tax of four and three-quarters mills in the first section thereof, and purports to authorize the county commissioners of Charleston county to levy a tax sufficient to raise the sum of $3000 for the Charleston military in the second section thereof; whereas the act, as it passed the senate and house of representatives, purported to levy a tax of only four and a half mills in the first section thereof, and did not contain any provision whatever, authorizing the levy of any tax for the Charleston military.

That the said act, when sent, after its passage in the house, to the senate, purported to authorize a levy of a tax of four and a half mills in the first section thereof, and the senate amended the said section by striking out the words "a half," and inserting in lieu thereof "three-quarters," in which amendment the house refused to concur, and the senate receded therefrom.

That the senate amended the second section thereof, by inserting therein the following provision : "That the county commisioners of Charleston county be, and are hereby authorized and required to levy a tax upon all the taxable property of said county sufficient to raise the sum of three thousand dollars, which tax shall be paid at the same time with other taxes. The proceeds arising therefrom shall be held by the treasurer of said county, subject to the draft of the major-general commanding the first division, and shall by him be apportioned, as follows : the one-tenth thereof, for the use of the militia in said county without the city of Charleston ; another tenth thereof to the use of the first regiment of the national guard ; and the remaining eight-tenths to be equally divided amongst the companies composing the fourth brigade, by companies."

In which amendment the house refused to concur and the senate receded therefrom, all of which fully appears in the journals of the senate and house of representatives. Wherefore it being in the apprehension of this respondent, involved in the gravest doubt whether the said alleged act has been passed in accordance with the requirements of the constitution, and has

authorized any notification whatever to the county auditors of the state by this respondent as comptroller-general, and even, if so authorizing, whether this respondent should include in such notification any rate per centum as authorized by law, to be levied for the various state purposes; and if so, what rate; and whether he should include in such notification the provision as to the Charleston military in the second section of said act hereinbefore specially set forth: this respondent has felt it not to be in the line of his official duty to proceed in any manner under the said alleged act, save under sanction of the proper judicial tribunal.

Wherefore this respondent submits himself to the order of this court in the premises.

This return was verified and was not traversed; the matters therein stated were admitted to be true.

*Mr. Youmans*, attorney-general, for the relator.

We make no charge of contumacy against the comptroller-general. The matter being involved in doubt, it was not proper for him to proceed, nor for the governor to convene the legislature, without legal sanction.

The particular question here is novel only in the instance, but may be solved by legal formula and under well-established principles of law.

It is the highest exercise of the powers of courts in the American States, to declare an act unconstitutional. No more of an act should be declared unconstitutional than is clearly so, and that being stricken out, the remainder must be sustained. The only objection to this act is that one-quarter mill additional has been added on in the first section, and the Charleston military tax levy in another section. Strike both out and the remainder stands.

*Prima facie* it is the duty of the comptroller-general to execute the act as it stands on the statute-book. But under decision in *Blackwell* v. *Barnwell*, or *State* v. *Platt*, 2 *S. C.* 150, the court can go behind the signatures and the great seal, which seems to be the American rule; and we agree that that case is the law of this. See to same point, 4 *Otto* 260. The courts, however, will

not interfere, unless the departure from the constitution is patent and plain. *Fletcher* v. *Peck*, 6 *Cr.* 87, and other cases say so. They also say part may be good and part bad, and only the bad will be declared unconstitutional. There is difficulty sometimes in separating good from bad, but where, the bad being stricken out, the good part remaining is capable of execution, it must stand; the whole must fall only where the two are so inter-dependent that it cannot be presumed that the legislature would enact one without the other. *Sedg. on Const. Law* 413; *Cooley Const. Lim.* 177.

The precise constitutional objection here is in Article II., Section 21, of the constitution, where the ratification of an act is prescribed. This act passed the general assembly with a tax levy of four and one-half mills; there was added at the ratification an additional one-quarter mill and the Charleston military tax levy. Both of these additions, we concede, must go. Here lies our trouble, but we will show that the four and three-quarters mills is capable of separation, and that if it can be, it must be. *State* v. *Copeland*, 3 *R. I.* 36; and compare 13 *Rich.* 498 with 14 *Rich.* 129. So, too, in *Homestead Cases*. Courts hold same words good as to future contracts, but void as to past. See, too, 14 *Pick.* 96. We do not think four and three-quarters can stand; we do think that four and one-half can; that they are separable, that the one-quarter is not necessarily dependent on the four and one-half. The journals show that there was no struggle for diminution; the senate proposed to amend by sub-stituting "three-quarters" for "one-half" and the house did not concur. This shows that a foreign substance, one-quarter mill, was attempted to be added, and did slip in at the ratifica-tion. This proves that the four and three-quarters mills is sepa-rable. Nothing on earth is so exactly separable as numbers, and hence mathematics is a certain and exact science. The one-quarter mill here was simply an addition which may be taken off. In approving the four and three-quarters mills, the governor approved the four and one-half mills, for *majus minus continet.* It cannot be said that the governor approved the greater tax, but might have vetoed the lesser. Such a course by the executive would be unparalleled; it is for the legislature to determine what

the tax levy shall be. Even if the amounts were grossly dispro-
portioned, the greater would include the less.

*Mr. J. T. Rhett,* for respondent.

We accept the law strictly as laid down in *State* v. *Platt,* 2 *S.
C.* 150, and confirmed in 4 *Otto* 260, and 3 *R. I.* 33. In our
case all of the facts are fully stated in the return and admitted.
As to the Charleston military tax levy, that is clearly within the
decision of *Blackwell* v. *Barnwell.* As to the four and three-
quarters mills, not being constitutionally passed, the whole act goes
with it. .2 *S. C.* 157, 160; *Cooley Const. Lim. (1st ed.),* ch.
*VII.,* § 6, *pp.* 178, 179. The four and three-quarters mills
tax levy is clearly not good in whole; is it .in part? One view
is that the "four" not being changed at all, neither the "one-
half" nor the "three-quarters" is valid, but being lopped off,
the act stands good for four mills. This sticks too much to the
letter, and cannot be a proper one unless it would fit other
figures; as, for instance, a substitution of five for four and one-
half. This view ignores the fact that four and three-quarters is
as much an entity as five or one. Another view, and that of the
attorney-general, is, that the law should be enforced for four
and one-half, leaving out the one-quarter mill erroneously added.
To do this, you must go beyond the decision in *Blackwell* v.
*Barnwell,* which simply struck out and then went back to a pre-
existing law; you must replace words, and thus legislate and
not adjudicate. You must also ignore the governor's right of
*veto,* or explain it away by saying that his approval of the
greater was an approval of the lesser number. This is a fanci-
ful and mathematical view scarcely conceivable in the intent of
the constitution.

Again, words are the expression of thoughts, and thoughts,
whether in one word or more, are no more divisible in the math-
ematical sense claimed for any effectual purpose connected with
the thought itself, than words are divisible in letters for any
effectual purpose connected with the word itself. Four and
three-quarters is a fixed quantity, an entity; a thought in itself
complete and absolutely single.

January 26th, 1879.    The judgment of the court was delivered by

WILLARD, C. J.    This was an application for a *mandamus* to compel the comptroller-general to notify each county auditor in the state of the rate per centum of the tax authorized by law to be levied for various state purposes, and to prepare and transmit to each county auditor the necessary forms and instructions to carry into effect the provisions of the act to raise supplies, &c., approved December 24th, 1879.    The return of the comptroller-general, which is not traversed, and which must, therefore, be taken to be true, raises two legal questions.    *First*, as to the validity of the first section of the act fixing the amount to be levied for general state purposes; and, *Second*, as to the validity of the provision in the second section for the military organizations in the county of Charleston.

A majority of the court having reached the conclusion that the error in the first section is fatal to the validity of that section, and the court having unanimously reached the conclusion that so much of the second section as makes provision for the Charleston military organizations is without the force of law, it is ordered that the motion for *mandamus* be refused.

The following opinions were subsequently filed in this case:

WILLARD, C. J.    The relator asks for a writ of *mandamus* to compel the performance of certain duties imposed by law upon the comptroller-general where an act has been passed directing the imposition of a general tax, looking to the enforcement of such law.

No question is raised as to the propriety of the remedy, in the event that it shall be held that authority exists for the performance of the duties sought to be enforced.

The single question propounded is, whether the act entitled "An act to raise supplies and make appropriations for the fiscal year commencing 1st November, 1879," is authority for proceedings on the part of the executive officers to levy and collect a tax for state purposes.

It appears by the pleadings, and also by the journals of the general assembly, that the act, as passed by the two houses, di-

rected a tax of four and one-half mills, but that the act, as rati-
fied and published, directs the imposition of a tax of four and
three-quarters mills.

It cannot be questioned that the amount of tax is a material
part of the act, and that it cannot be enforced unless that amount
is ascertained to have been fixed by the act. It is obvious that
the legislature did not intend to leave the amount of the tax to
be ascertained by the executive officers of the government, if such
a delegation of authority is permissible; but that it was intended
that the amount of the levy should be ascertained by the law
itself. We must, therefore, inquire whether the act itself has
ascertained the amount of tax to be levied in a conclusive and
binding form.

It cannot be questioned that, independently of constitutional
authority vested in this court, enabling it to look into the actual
proceedings of the bodies composing the general assembly, to
ascertain the fact of compliance with some constitutional require-
ment on which the validity of the law depends, the evidence
afforded by the certificates of the presiding officers, the great seal
affixed to it, and the approval of the governor, must be regarded
as conclusive evidence of the action of the legislative body. Such
was the law of England, from which our ideas of the force and
effect of statutes were derived, and it has become embodied in
our jurisprudence. It is then only when we can point to con-
stitutional authority for the purpose that we can demand other
evidence of the authenticity of an act, than that which is afforded
by the customary modes of authentication.

Section 21, Article II., of the constitution of this state, pro-
vides as follows: "No bill shall have the force of law until it
shall have been read three times and on three several days in
each house, has had the great seal of the state affixed to it, and
has been signed in the senate-house by the president of the
senate and the speaker of the house of representatives." It
cannot be denied that the existence of each one of these requisites
is essential to the validity of an act. *State* v. *Platt*, 2 *S. C.* 150.
It is not enough that the great seal shall be affixed, and that the
presiding officers of the two houses shall affix their signatures,

but, in addition to this, the bill must have had its three readings on three several days in each house.

It will not be disputed that the courts are competent to ascertain and declare effectively whether the constitutional conditions, on which the force of an act depends, exist. To perform this duty it is necessary to ascertain the existence of the fact of the three readings, and, applying the rules that govern all judicial proceedings, such inquiry must be made in accordance with the rules of evidence that belong to the subject, according to its nature. In the present case, if we come to the conclusion that the act, as published, is not identical with the bill from which it originated, we are relieved from all intricate questions as to the nature of the proofs available for such an inquiry; for the facts admitted upon the pleadings, and the journals of the houses, read with the original bill, sustaining that statement of facts, show that the act, as ratified, was not read three times in each house on three several days. If such was the case, then the constitution denies, in express terms, the force of law to such bill, and the act, as ratified, stands as though it never existed in the form of a bill before the two houses, and is not effective as a law. If such be found to be the case, our competency and duty so to declare are manifest.

The question then arises, whether want of identity between a ratified act and the bill in which it claims to have originated, is fatal to such ratification. Stating this question in this broad manner places it beyond a doubt. If the legislative bodies enact one law and the presiding officers and the custodian of the great seal publish another, of a totally different nature, to allow force to such publication would defeat all the objects intended by the constitution. It would be placing the homage due to the great seal before the constitution, and all the practical safeguards devised by the experience of popular government for the protection of the people; it would be giving a legal *stone*, though ornamented with the arms of the state, for the constitutional *bread* of efficient protection. Fictions of law are often convenient when dynastic interests are to be upheld against the reason that commends popular rights, but have no place in interpreting the great

instrument from which all governmental power springs, and by which its efficacy is to be tested. Of what avail are all the safeguards of liberty and property, with their carefully-studied provisions, giving form to legislative procedure, if the custodian of the great seal and the presiding officers of the two houses of the general assembly can, by an arbitrary act, divide between themselves public property and public power? That such efficacy should be ascribed to the great seal in England, is easily understood, for the imposition of that seal was considered as a personal act of the sovereign, who, according to legal ideas, could not do wrong, but that such a doctrine could have any advocacy in a government that professes to be one of laws and not of personal authority, is not readily accounted for.

The attorney-general has placed the case of the relators on ground that allows full force to the considerations that have just been stated; but whether he has distinguished the case successfully from one in which the ratified act is totally different from the bill as passed, remains to be examined.

It would follow, from what has been already stated, that the act, as ratified, must, to have the force of law, be substantially identical with the bill that received its several readings in the houses. What, then, is the test of such identity? Many cases may be supposed that would give rise to nice questions as to what deviations affect the question of identity and what do not, but the present case is free from any such difficulty. It is the highest prerogative of the legislative body to impose taxes and prescribe limits to the burden of taxation. The value and importance of this prerogative is expressed by the cost in blood and treasure of the establishment of the authority of the house of commons of Great Britain as the constitutional means of expressing the popular will. The quantity that the people shall be taxed is of the very life and essence of an act raising supplies for the maintenance of the government. It was not the abstract right of imposing taxes that was the matter of contest between Charles I. and the house of commons, but to what extent and in what manner such taxes should be imposed. At this day the vital question involved in every supply bill is, how much shall the people be taxed? To say, then, that a bill authorizing taxa-

tion to a specified amount and an act fixing a different amount
are identical is to hold that the amount of the tax is an immaterial
part of the bill, and to contradict both public history and reason.
It follows that the bill in the present case that authorized a tax of
four and one-half mills was not identical with the act before us that
assumes to impose a tax of four and three-quarters mills, and the
act as it stands cannot have the force of law, for want of the
requisite readings in the two houses of the general assembly.

It was contended, however, that the quarter mill may be re-
jected as something superadded to the amount of the tax directed
by the bill as passed, which, not having been a part of the bill,
may be rejected from the ratified act, leaving the amount of four
and one-half mills valid and capable of enforcement. We have
not been pointed to any authority for thus disintegrating the pro-
visions of a law and rejecting part and retaining the residue.
*State* v. *Platt*, 2 *S. C.* 150, is an authority for rejecting some
independent provision of an act that may be severed from the
other provisions of an act without affecting their efficacy, where
such independent part has failed to receive constitutional enact-
ment; but it does not go to the extent of holding that the
words of an act may be changed to express the real intention of
the legislature that has been imperfectly expressed in the ratified
act. It is contended that the declaration of an intent to impose
a tax of four and one-half mills is embraced within the direction
to levy a tax of four and three-quarters mills, and that all that is
necessary is to reject the excess. This argument is placed on the
ground that a numerical statement is in its nature severable into
its parts so that a portion of the sum stated may be good and
another portion bad. It is true that the subject of a numeri-
cal statement may be regarded as in its nature divisible with
reference to a known unit, but the verbal statement of that sum
is not for that reason necessarily divisible. The one is a ques-
tion of arithmetic and the other of logic. It cannot be claimed
that the court can re-state the language of an act to make it
agree with some possible conclusion as to its intention as affecting
the subject matter of the act. The language declaring the intent
of an act is as much beyond our power as the subject to which
that declaration relates, and it would violate the principles of

law to change the phraseology of a statute to make it conform to the assumed purpose of the law-giver in any other way than as warranted by the rules' of construction. It is not contended and cannot be claimed that the present difficulty can be overcome in conformity with the principles of construction. The proposition is, in its real nature, that we should reform the language of the statute to give it efficacy under the constitution, and that cannot be done consistently with the principles of law that bind the court. It is to be regretted that this court has no power to obviate the inconveniences that must arise from the conclusions that have been stated; but usurpation by the court of authority for that purpose would tend to inflict a permanent injury upon the balance of authority established between the legislature and the courts, while the inconveniences that result from adhering to a clear and simple line of duty will be temporary at the most.

The ratified act does not appear to have received the constitutional sanction of the general assembly, and cannot be reformed in the manner claimed by the relators. The motion should be dismissed.

McIVER, A. J. The question in this case is as to the validity of the act passed at the last regular session of the general assembly, entitled " An act to raise supplies and make appropriations for the fiscal year commencing first of November, 1879."

It is conceded that the act as enrolled and signed by the president of the senate and speaker of the house of representatives, approved by the governor, and to which the seal of the state has been affixed, provides in its first section for the levy of a tax of four and three-quarters mills on the dollar, exclusive of the public school tax, for the purpose of defraying the current expenses of the state government, &c., and in its second section authorizes and requires the county commissioners of Charleston county to levy a tax sufficient to raise the sum of $3000 for the use of the military organizations in that county; but that an inspection of the journals of the general assembly, in connection with the original bill, will show that by the act as it actually passed the two houses, the amount authorized to be levied in the first section, was four and one-half, instead of four and three-

quarters mills, and that there was no provision therein authorizing the levy of any tax for the benefit of the Charleston military organizations. Upon this state of facts, if the case of the *State v. Platt*, 2 *S. C.* 150, is to be regarded as good law, and it must be so regarded until it is overruled by proper authority, I think it is conclusive of the question now before the court. In that case the Supreme Court held that where the journals of the general assembly showed that by the act as it passed both houses "Blackville" was the place designated for holding the Courts of General Sessions and Common Pleas for Barnwell county, while by the act as enrolled and signed by the presiding officers of the two houses and approved by the governor, "Barnwell" was the place designated for that purpose, that so much of the act as related to that particular matter, inasmuch as it was not connected with or dependent upon any other part of the act, was a nullity and the balance of the act good. This was upon the ground that, under the constitution, it was necessary to the validity of a law not only that it should pass both branches of the general assembly but that it should also receive the approval of the governor, except in those cases provided for in Section 22 of Article III. of the constitution, which did not apply to the case then in hand. Now, as in that case, the portion of the act designating Blackville as the place for holding the courts had not received the approval of the governor it could not be the law, and as that portion of the act, as enrolled, which designated Barnwell as the place for holding the courts, had not passed the two houses it could not be law, and hence the whole attempt of legislating upon that subject proved abortive and the law remained as it was before. So, in this case, the attempt to fix by law the amount of the tax to be levied for the current expenses of the state government, as well as the attempt to provide for the levy of a tax for the benefit of the military organizations in the county of Charleston, has proved wholly abortive for the same reason which was held to have produced that result in the case of *State v. Platt*. The amount at which the general tax levy was fixed by one branch of the law-making power—the two houses composing the general assembly—is different from that which received the approval of the other branch—the executive—and neither, there-

fore, can have the force of law, as there is no pretence that the act in question became a law, notwithstanding the failure of the governor to approve it, in the manner prescribed by Section 22 of Article III. of the constitution. The act cannot be regarded as authorizing a levy of four and one-half mills, because the governor has never approved such an amount; nor can it authorize a levy of four and three-quarters mills, because the general assembly has never given its assent to the levy of such an amount.

It will not do to say that four and one-half being less than four and three-quarters, must necessarily be included in it, and as the governor has approved the greater amount he must be regarded as including in such approval the lesser amount also. Such an attempt to apply mathematical principles to moral questions will almost invariably lead to erroneous conclusions. It does not by any means follow that the approval of the larger number necessarily includes the approval of the smaller. For suppose, if such a supposition is permissible, that a legislature should pass an act to raise supplies which provided for a levy of one-tenth of a mill, and the act as approved by the governor should provide for a levy of a reasonable amount—say four mills —could it with any propriety be argued that the governor had thereby approved a levy ridiculously small and manifestly insufficient for the purposes set forth? True, this may be regarded as an extreme supposition, but if the proposition that the approval of the greater number necessarily involves the idea of the approval of the lesser number, be true in any case, resting as it does upon mathematical principles, it must be true in all cases.

Take another illustration. Suppose the legislature were to pass an act fixing the age at which one should pass from infancy to majority at fifteen years, and the act as approved by the governor should fix that age at twenty years, would it follow that because he approved twenty he thereby approved fifteen—that number being included in twenty, just as four and one-half is here alleged to be included in four and three-quarters? It must be remembered also that the very purpose of the section of the act now under consideration was to fix *the amount* of the tax to be levied, and when the different branches of the law-making power

have declared *for different amounts,* I am unable to understand how either declaration can be regarded as law.

By the same course of reasoning it could be shown that the provision for the Charleston military organizations is open to the same objections.

It seems to me, therefore, that, unless the case of *State* v. *Platt* is overruled, which the majority of the court are not now disposed to do, the first section of the act in question as well as that portion of the second section which purports to authorize the levy of a tax for the support of the Charleston military organizations must be regarded as without the force of law.

I think, however, that the case of *State* v. *Platt* cannot be sustained, either upon principle or authority, but that on the contrary it is opposed to the decided weight of authority and establishes a rule which may, in some cases, produce disastrous results, and that it should be overruled.

The true rule, in my judgment, is that when an act has been enrolled, has had the great seal of the state affixed to it, has been signed by the president of the senate and speaker of the house of representatives and has been approved by the governor, it imports absolute verity; that its terms can only be finally ascertained by an inspection of the enrolled act, and that it is not competent to go behind it, and alter its terms either by entries in the journals of the two houses or any other evidence. Its constitutionality may, of course, be inquired into, both for the purpose of determining whether any of its admitted provisions are in conflict with the constitution, either state or federal, and also for the purpose of determining whether the journals show what the constitution requires they shall show in regard to acts for certain purposes; for instance, where an act purports to authorize the contracting of a public debt, whether the act was passed by a two-thirds vote taken by yeas and nays—because, by the express terms of the constitution, no such law can take effect until it has been passed by such a vote, which is required " to be recorded, *by yeas and nays, on the journals of each house."* Hence, if the journals fail to show such a record there is an absence of one constitutional requirement, which is just as fatal as if the act had not been signed by the president of the senate or speaker of

the house or had not been approved by the governor.    But as we have decided in *Grand Lodge of A. F. M.* v. *City of Charleston,* the mere fact that the journals fail to show that a bill has been read three times, on three several days in each house, does not invalidate the act, because, while the constitution *does* require that it shall be so read, it *does not* require that the fact that it has been so read shall be so recorded on the journals, and hence the omission of such record cannot affect the constitutionality of the act.

The same doctrine has·been held even in the State of Illinois (*Supervisors of Schuyler County* v. *People,* 25 *Ill.* 181,) a state whose decisions seem to be mainly relied upon to show that it is competent for the courts to look behind the act as enrolled and ratified, and by an inspection of the journals, or other evidence, determine whether any of its provisions have failed to receive the assent of the legislature.

But the proposition to examine the journals for the purpose of ascertaining whether certain words, clauses or sections which appear in the act as enrolled and ratified and approved by the governor, were in the original bill at the time it passed either or both houses, is a very different thing from looking into the journals for the purpose of ascertaining whether they contain· such entries as are required by the constitution to be recorded therein.    The journals are not made evidence for such a purpose by the constitution, they are not made so by any statute, they were not so regarded in England—a country from whence we have derived not only our fundamental rules of evidence, but a country whose parliament furnishes the model upon which the legislative assemblies of the United States have been constructed.    *Cush. Law and Practice of Leg. Assemb.,* § 197.

In *King* v. *Arundel, Hob.* 109, it was held that the journal "hath no power to satisfy, destroy or weaken the act, which being a high record must be tried only by itself."    But while it is conceded that such is the rule in England, it is argued that it cannot be applied here, where we have a written constitution.    I am unable to perceive how this can affect the question unless it could be shown that our constitution contains some provision

which would have the effect of altering the rule, and none such can be found.

The constitution in Article II., Section 26, does require that each house shall keep a journal of its own proceedings; but it does not prescribe what shall be therein entered except in certain instances. For example, in Section 24 of the same article, where it requires that "in all elections by the general assembly, or either house thereof, the members shall vote *viva voce*, and their votes thus given shall be entered upon the journal of the house to which they respectively belong," and in Section 7 of Article IX., where it requires that the vote upon a bill to authorize the contracting of a public debt shall be taken by yeas and nays and recorded on the journal. But there is no requirement that the terms of a bill shall be entered on the journal; and, as matter of fact, the provisions of a bill are never spread upon the journal, but only its title and the amendments proposed, and this is oftentimes done in such an imperfect and unintelligible manner as to render it necessary to refer to something else to make them intelligible. As, for example, in this very case, where, without reference to the original bill, it would be difficult, if not impossible, to tell what was the amendment to the first section.

It appears to me, too, that the decided weight of authority in this country is in favor of the English rule. In *Pangborn* v. *Young*, 32 *N. J.* 29, decided in 1866, the question was discussed with great ability and learning, and the conclusion was reached that, both upon principle and authority, it was not competent for a court to go behind the act as ratified and approved by the governor, and inspect the journals with a view to ascertain whether the act as actually voted upon and passed, contained different terms from that which had been ratified, approved by the governor and filed in the office of the secretary of state. The same doctrine has been held in Connecticut, in 1849 ; *Eld* v. *Gorham*, 20 *Conn.* 8. In Maryland, in 1858, *Fouke* v. *Fleming & Douglass*, 13 *Md.* 392, and again in 1870, in *Mayor* v. *Harwood*, 32 *Md.* 471 ; though the court in that state, in the subsequent cases of *Berry* v. *Baltimore and Dunn Point Railroad Company*, 41 *Md.* 446, decided in 1875, and *Legg* v. *Mayor*, 42 *Md.* 203, decided also in 1875, while not overruling the two

cases first mentioned do seem disposed to take a somewhat dif-
ferent view of the question. In Indiana, in 1869, in *Evans* v.
*Browne,* 30 *Ind.* 514. In New York, in 1865, in *People* v. *Dev-
lin,* 33 *N. Y.* 269. In Louisiana, in 1871, in *La. State Lottery
Co.* v. *Richoux,* 23 *La. Ann.* 743. In Nevada, in 1875, in *State*
v. *Swift,* 10 *Nev.* 176. In the Nevada case, which is one of the
most recent decisions upon the point that I been able to find, the
American authorities are elaborately reviewed. In that case it is
said that question "appears to have been decided in fifteen states;
in nine states, viz., Connecticut, New York, New Jersey, Mary-
land, Missouri, Iowa, North Carolina, Indiana, California, the
old rule is upheld. In six states, viz., Alabama, Arkansas,
Illinois, South Carolina, Minnesota and New Hampshire, it is
repudiated. In Michigan there are *dicta* in favor of the new
departure. In Ohio and Kentucky the question has been noticed
but its decision waived. In Mississippi the court divided on the
question." The learned judge then proceeds to show that the
decisions in the six states above alluded to, with the exception
perhaps of those of New Hampshire, either ignore all precedents
or are rested upon authorities which have either been overruled
or do not establish the position which they are cited to support.
Not having access to all the cases he refers to I have not been
able to verify his assertion, but so far as I have been able to
prosecute my researches I find his assertion, in the main, sus-
tained. It is very manifest that the decision in this state does
not purport to rest upon the authority of any decided cases, as
not a single one is referred to. The Illinois cases, which seem
to be principally relied upon to support the new rule, do not, as
it seems to me, furnish that support. The constitution of that
state, adopted in 1848, which was of force at the time the earlier
cases were decided, as well as that adopted in 1870, which is
now and was of force at the time the later decisions were ren-
dered, provides (the italics being mine) that on the final passage
of *all* bills, the vote shall be by ayes and noes, *and shall be en-
tered on the journal;* and no bill shall become a law without the
concurrence of a majority of the members elected to each house,"
differing in this respect very materially from the constitution of
this state. Now the Illinois cases which are relied upon as sup-

porting the new rule, all seem to be cases in which the question was whether it was competent to resort to the journals for the purpose of showing that this constitutional requirement had not been complied with.

They therefore may rest upon the same principle which has been adopted here, viz., that where the constitution requires, in express terms, that in order to make an act valid, certain entries must be made upon the journals, the absence of such entries is fatal to the act. But the same court, as we have seen above, in the case of *Supervisors of Schuyler County* v. *People*, has held that the fact that the journals fail to show that a certain bill was read three times on three several days, does not affect its constitutionality, because, while the three readings *are* required by the constitution, the fact that it has been so read is *not* required to be entered on the journals. This distinction seems to be recognized in the case of *Osburn* v. *Staley*, 5 *W. Va.* 85, decided in 1871, where the decision was placed upon the ground that as the constitution of that state, then in force, like the constitution of Illinois above quoted, required all bills to be passed by a vote taken by ayes and noes, which must be entered on the journals, the court could look to the journals to see if this constitutional requirement had been complied with.

It seems to me that the English rule is supported by the decided weight of authority in this country, and as is abundantly shown in the able and elaborate opinion of the Chief Justice of New Jersey, in the case of *Pangborn* v. *Young, supra*, to which especial attention is invited, that it is founded upon well-settled principles and is recommended by every consideration of public policy.

It is an entire mistake to suppose that this rule rests upon the idea that any peculiar sanctity should be attached to the great seal of the state. The question to be determined, in cases of this kind, is one of fact: what are the terms which have been used by the legislature in a statute—not what the construction of admitted terms should be, nor whether certain requirements of the constitution have been complied with, which are questions clearly within the scope of judicial cognizance. If an act as enrolled, signed by the presiding officers of the two houses, with

the seal of the state attached, and bearing upon its face the approval of the governor, is not to be regarded as conclusive of the terms which it contains, then, indeed, is the question as to what is the written law of the land involved in the greatest uncertainty. If courts can go behind such an act and inquire whether each and every word of it has actually received the assent of the legislature, then the question very naturally arises how far can they go, and what kinds of evidence may be resorted to? Are the journals conclusive, or can they, as is said to have been done in one of the Illinois cases (*Turley* v. *County of Logan,* 17 *Ill.* 151,) receive parol evidence "and on recollection of members, and by the manuscript notes of the clerk," amend the journals and thereby alter the terms of the enrolled act? If so, then rights which depend upon a statute are held by the most shifting and uncertain tenure. There is no mode by which the question as to whether a statute actually contains or should contain certain terms, can be finally tested and definitely set at rest, if the rule established by the case of *State* v. *Platt* is allowed to prevail. When the question is as to the construction of the terms used in a statute, whether terms are in conflict with any constitutional provision, or whether the journals show what the constitution requires that they shall show, a decision in one case, being a decision of a question of law, would be binding in all subsequent cases; but when the question is whether certain words or clauses which are found in a statute which has been duly enrolled, ratified and approved, actually received the assent of the legislative will, a decision in one case would not be conclusive in another like case, between different parties, because it would depend upon the solution of a question of fact, and the decision of such a question could only bind the parties to such case and their privies. When the question arises again between different parties it would be entirely open, and the result might be that in one case the statute would be held to contain certain provisions, while in another the reverse might be decided. So that what was supposed to be law one day, in one county, would not be law the next day in another county. But if it should be argued that the journals are to be regarded as conclusive and that no other evidence can be received, then the question very naturally

E

arises, why should the journals, made up, as they are, hastily, amidst the excitement and confusion incident to most legislative bodies, by subordinate officers of the two branches of the general assembly, be entitled to any more credit than the enrolled act, reported by committees of the bodies themselves as correctly enrolled and ready for ratification, and authenticated by the signatures of the presiding officers?

Why should the journals, which are kept by a subordinate officer, be any more entitled to respect that the work of another subordinate, *supervised as it is required to be by committees of the two houses and authenticated by the signatures of the presiding officers?* If anything, the latter would seem to be entitled to the higher degree of credit.

It will not do to say that the journals are read over daily in the presence of the members and are adopted by them as correct, for to say nothing of the weight which this suggestion would probably have in the minds of those who are familiar with the usual custom of legislative bodies in this regard, it is very certain that the journals of the last day of the session, which are apt to contain some of the most important proceedings, are not so read over, even in theory, and cannot, therefore, be said to have received the approval of the members. Nor will it do to say that the rule contended for leaves the legislation of the country at the mercy of a careless or dishonest engrossing clerk, for if the committee on enrolled bills do their duty, as every court is bound to assume that they will, there can be no danger of any improper or careless addition to, or omission from the bills as they actually have been passed.

No rule that can be devised will prove absolutely perfect, and the great matter is to have a certain definite rule, capable of easy application, which is best calculated to effect the end in view. The practical question, therefore, is, whether it is better to adhere to the rule which has prevailed for ages in the country from which our jurisprudence has been mainly derived, and which, having worked well there, has been adopted by a number of the states of this Union, and which undoubtedly has the merit of being simple, definite and easy of application, or shall we adopt another which undoubtedly tends to render the law uncertain,

which has not, as yet, assumed any definite shape, and which will be attended by the gravest inconveniences and perhaps dangers by opening the door for frauds and affording the strongest temptation to tamper with the journals of the legislature?

The new rule, as it may be called, certainly has not, as yet, assumed any definite shape, for although it is said in *Berry* v. *Baltimore and Dunn Point Railroad Company*, 41 *Md.* 446, in speaking of the cases in which the new rule has been adopted that "they all seem to concur in maintaining that no statute, having the proper forms of authentication, can be impeached or questioned upon mere parol evidence," yet, as we have seen in the case of *Turly* v. *County of Logan*, above referred to, parol evidence was received to amend the journals and thereby correct the enrolled act. So, also, in *Gardner* v. *Collector*, 6 *Wall.* 511, the Supreme Court of the United States said that in a question of this kind "the judges who are called upon to decide it, have a right to resort to any source of information, which in its nature, is capable of conveying to the judicial mind a clear and satisfactory answer to such a question"—language which would surely warrant a resort to parol evidence. And in the case of *State* v. *Platt* no such limitation of the rule is to be found. On the contrary, that case holds that resort may be had to the journals or other appropriate evidence, which, certainly, does not necessarily forbid a resort to parol evidence. Indeed, few, if any, of the cases undertake to prescribe what kind of evidence should be received for the purpose of correcting the terms of an enrolled act, and therefore, it seems to me, the question may be regarded as still an open one.

While, therefore, I have been compelled by the view which I take of the case of *State* v. *Platt* to concur in the result reached by the Chief Justice in this case, I have thought it to be my duty to place on record the grounds of my dissatisfaction with the rule established by that case.

McGOWAN, A. J. This is a petition by the attorney-general of the state against the comptroller-general for a writ of *mandamus* commanding him forthwith to notify each county auditor of the rate per centum authorized by "An act to raise supplies

and make appropriations for the fiscal year commencing 1st November, 1879," and approved 24th December, 1879.

Under the law, it is the duty of the comptroller-general, as the head of the fiscal department of the government, to have enforced acts of the legislature which levy taxes, and to issue to subordinate officers in that department all instructions and forms necessary for that purpose. But for the reason which appears in his return, the comptroller-general refuses to have said act carried into effect; wherefore the attorney-general filed this petition for *mandamus* to compel him to do so.

The return is not traversed and must be taken to be true. It contains the following statement of facts:

" That the alleged act, as ratified and approved, purports to levy a tax of four and three-quarters mills in the first section thereof, and purports to authorize the county commissioners of Charleston county to levy a tax sufficient to raise the sum of three thousand dollars for the Charleston military in the second section thereof; whereas the act, as it passed the senate and house of representatives, purported to raise a tax of only four and one-half mills in, the first section thereof, and did not contain any provision whatever authorizing the levy of any tax for the Charleston military.

" That the said act, when sent, after its passage in the house, to the senate, purported to authorize a levy of a tax of four and one-half mills in the first section thereof, and the senate amended the said section by striking out the words ' one-half ' and inserting in lieu thereof ' three-quarters,' in which amendment the house refused to concur and the senate receded therefrom. That the senate amended the second section thereof by inserting the provision for the Charleston military, (copied in full,) in which amendment the house refused to concur and the senate receded therefrom ; all of which fully appears in the journals of the senate and house of representatives," &c.

Upon these facts, admitted and confirmed by the journals, the question is purely one of law, whether the act referred to is constitutional and valid in whole or in part, for if it is, the *mandamus* must be granted to enforce it, and otherwise not.

The act is found among the archives in the office of the sec-

retary of state with other public acts passed at the last session, signed by the president of the senate and the speaker of the house of representatives, approved and signed by the governor, and having attached the great seal of the state.

It is a record of a very solemn character, and must be regarded as constitutional, certainly until the contrary clearly appears. It may be assailed, and whether it is what it purports to be, a valid law under the constitution, is a judicial question. The courts have the right to declare an act of the legislature unconstitutional in whole or in part, but that right should be exercised with great caution. It is a solemn act to declare that that body to whom the people have committed the sovereign function of making the laws, have disregarded the limitations imposed upon them, and it should only be done in cases where the constitution has been clearly, palpably and plainly violated, and then only to the extent of such violation.

It is not suggested that the act under consideration is unconstitutional because it violates any principle in regard to the subject matter, such as impairing the obligation of contracts, &c., but that as it was enrolled and now stands upon the statute-book, it was not, in two of its most important parts, passed by the legislature according to the forms of the constitution, and is therefore not law.

The constitution declares as follows: Article II., Section 21—"No bill shall have the force of law until it shall have been read three times and on three several days in each house, has had the great seal of the state affixed to it, and has been signed in the senate-house by the president of the senate and the speaker of the house of representatives."

Article III., Section 22—"Every bill or joint resolution which shall have passed the general assembly, except on a question of adjournment, shall, before it becomes a law, be presented to the governor, and if he approve it he shall sign it; if not, he shall return it, with his objections, to the house in which it shall have originated, which shall enter the objections at large on its journals and proceed to consider it," &c.

Most of the states of the Union have constitutions with provisions more or less similar to those in our constitution above

quoted. In many of them the question has been much discussed, whether an act regular in form, signed by the proper officers of each house, approved by the governor, and having attached to it the great seal of the state, constitutes a record from a co-ordinate branch of the government so solemn as to make it conclusive evidence of the passage of the act as enrolled; or whether the journals of each branch of the legislature may be considered and treated as authentic records of the proceedings of the legislature, to ascertain whether the two houses, in fact, concurred in the passage of the act. In this discussion it is conceded, on both sides, that in England an act of parliament proves itself, and is not subject to judicial inquiry—that the act, as enrolled by the clerk of parliament, so long as it existed, was held to import absolute verity. There are two distinct currents of opinion in the states having written constitutions—one holding that it is not only legal but wise to adhere to the old English rule, and the other that the judiciary department may, and indeed must, look beyond the seal and inquire whether that which purports to be law has been passed in the manner prescribed by the constitution. The states seem to be about equally divided upon the subject. In New Jersey, Nevada and some others, the old English rule is upheld. In Illinois, New Hampshire, Minnesota, Alabama and others, the opposite view is taken. In this conflict of opinion South Carolina has ranged herself with the latter class and in favor of what may be called the American doctrine on the subject. In considering the effect of the provisions of our constitution already cited, this court, in the case of *State, ex rel. Attorney-General,* v. *Platt,* 2 *S. C.* 150, has held "that the enrolled act, duly authenticated, as the constitution requires, and approved and signed by the governor, is not conclusive evidence of the terms of a bill as it passed the houses of the general assembly; but the journals of the houses, or other appropriate evidence, may be received to show what those terms were, and whenever it appears that the enrolled act differs from the bill as it passed, in a *substantial matter,* the judiciary department of the state may declare the whole act, *or the part affected* by the change, unconstitutional and void."

According to the well-established rule of *stare decisis,* the

principles here announced are law in South Carolina, and they must decide this case.

Let us apply them to the act under consideration. It appears in the most conclusive manner—in fact it is admitted—that the act as ratified, and the bill as it passed the two houses, "differ" in two important particulars. The one levied in the first section four and one-half mills, and nothing in the second section, for the Charleston military; the other levied, in the first section, *four and three-quarters mills*, and in the second section provided a tax to raise $3000 for the Charleston military. It is not denied that the particulars in which they "differ" are *substantial;* then it must follow, from the case of Platt, that we may declare the whole act, or *the part affected by the change*, unconstitutional and void. These new provisions were not passed in the manner prescribed by the constitution, but are mere interpolations, and we have no hesitation in holding that, to the extent of these interpolations, the act is unconstitutional and void, and that no *mandamus* should be issued to enforce the act, so far as they are concerned.

Then how does the act stand with these provisions declared null? Is the remainder binding as law, or does that necessarily have the effect of invalidating the whole act or of the whole section in which the bad parts adhered? If that is the law, it must be so declared; but it would be a strange and unfortunate result that, even after the interpolations are annulled, they should have the effect of destroying that which, but for their presence, would be regular and valid.

It is said, in more than one of our decided cases, that it is the business of the court to give effect to the intention of the legislature when it can be ascertained, and not to lend too ready an ear to hinder or subvert it. Here the intention of the legislature is in no way doubtful. They intended to levy a tax of *four and one-half mills* in the first section, and to authorize no levy for the Charleston military in the second. That was expressed in the bill as it passed both houses, and if the effect of declaring null the interpolations can be limited to those parts, the act will stand as it passed the houses and express the exact intention of the legislature.

The supply and appropriation act, from its very nature, has many different provisions, distinct from each other. It has one general purpose, but in carrying out that purpose separate and distinct subjects are introduced; and it would seem reasonable that if one of these limbs should be unsound it might be amputated without destroying the whole body. It is no new thing in South Carolina that part of an act should be declared to be unconstitutional and the other part remain unaffected.

The constitution of the state was adopted by the people as a whole, *uno flatu,* yet parts of it have been declared void, leaving the remainder in full operation. *Calhoun* v. *Calhoun,* 2 *S. C.* 283; *Cochran* v. *Darcy,* 5 *S. C.* 125. The act of the legislature known as the stay law, has been declared unconstitutional in part (*State* v. *Carew,* 13 *Rich.* 498,) and the remainder declared constitutional in another case. *Wardlaw* v. *Buzzard,* 15 *Rich.* 158.

An act of the legislature contained, among others, a provision that the court for Barnwell county should be held at Barnwell court-house. That part as to the place where the court should be held was declared bad, and the remainder of the act left in full operation. In that case it is said "*the residue* of the act beyond that portion held by us not to be of force as law, is unaffected thereby, inasmuch as that is a distinct and independent matter, in no way affecting the scope and efficiency of the act, according to the intention of the law-maker." Accepting this principle as the test, there is no doubt that the declaring null the provision for the Charleston military in the second section, leaves unaffected the remainder of that section and the act, inasmuch as that is clearly a distinct and independent matter. The integrity of the act is not affected, for it is left in that respect as it stood originally.

Can we affirm the same as to the portion of the first section which remains, after declaring null the bad quarter mill injected into it? This is the most difficult question in the case, and it must be determined by the fact whether the interpolation can be eliminated from the act *as a separate and independent matter.* The enrolled act reads "four and three-quarters mills." We have already declared that one-quarter mill of that is bad, and if the bad quarter mill had been added by a *separate clause* like this,

*and one-quarter mill in addition thereto,* leaving the original text, four and one-half mills, unchanged, there would be no difficulty, for then the supplemented sentence might be declared void and still leave the remainder of the sentence as law, reading four and one-half mills.   But the original text expressing numbers, the addition was made, not by a *separate sentence,* but by simply changing the arithmetical expression four and one-half to four and three-quarters.   The addition made was, in effect, precisely equivalent to making it by a separate sentence.   The difficulty arises, not from the nature of the thing, but from the manner in which it is expressed.   We do not understand that the matter expressed in the enrolled act, " four and three-quarter mills," is an indivisible unity, but, as we know, is only the manner of expressing at least two other quantities, " four and one-half" and " one-quarter," as to both of which we have a distinct conception. The history of this matter itself shows that it is divisible.   As the bill passed the houses, it read four and one-half mills—in some way one-quarter mill was added, so that it now reads "four and three-quarters mills."   These are clearly distinct and separate. Is it possible that the bad quarter mill cannot be eliminated only because of the phraseology in which it was incorporated?   The law aims at the substance of things.   Judge Cooley, in his Constitutional Limitations, p. 178, says : " The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall."   The quarter mill added is *" distinct and separable,"* although it is not expressed separately, but is included in the compound arithmetical phrase " four and three-quarters mills."

A motion to strike out and insert is an entirety, and, if it is not passed, nothing is stricken out.   It is not proposed to insert anything in the act that is disclaimed as beyond the jurisdiction of the court, but, in effect, to restore it as it passed the houses, and thus give effect to the clear intention of the law-makers.   I can see no insuperable difficulty in declaring it null and void as to one-quarter mill, and as law to the extent of four and one-half mills.

I am of opinion that the writ of *mandamus* should be granted

to enforce so much of the act as is herein declared to have the force of law, viz., the levy in the first section, to the extent of four and one-half mills; and the second section, except the provision for the Charleston military.

Application refused.