14165

STATE *EX REL.* FRIER *ET AL.* v. STATE BOARD OF
EDUCATION *ET AL.*

(183 S. E., 705)

*Messrs. John M. Daniel, Attorney General, J. Ivey Humphrey* and *M. J. Hough, Assistants Attorneys General* and *Eugene S. Blease,* for appellants,

*Messrs. Gary Paschal* and *John W. Sholenberger,* for respondents,

November 8, 1935.

The opinion of the Court was delivered by MR. JUSTICE BONHAM.

It appears that this case is brought upon the relation of the State of South Carolina, but it does not appear from the record that it is brought with the consent of the Attorney General of the State. The petitioners allege that this is due to the fact that the Attorney General, in his official capacity, as is required by law, has passed upon certain contracts and given his opinion upon the validity of contracts of the nature of those assailed by petitioners in this proceeding. No ques-

tion or point is made by the appellants of the procedure in the case, but it is deemed best that this explanation be inserted here lest pleaders be misled hereafter.

The petitioners, on their own behalf and on behalf of all other taxpayers and patrons of the free public schools of the State who have a common interest with petitioners but who are too numerous to bring before the Court, brought their action, by petition to the Court of Common Pleas for Richland County, to enjoin the State Board of Education, which consists of the Governor, Hon. Olin D. Johnston, the State Superintendent of Education, J. H. Hope, Miss Washington Green Pringle, Mrs. Florence Adams Mims, S. J. Derrick, H. N. Snyder, J. W. Thompson, T. C. Easterling, and S. H. Edmunds, from entering into and carrying out certain proposed contracts with the publishers of school books.

The cardinal allegation upon which this case turns is thus stated in the petition: "And that The Board on, or about, the first day of October, 1934, met for the purpose of prescribing and adopting textbooks to be used in the grammar schools of the free public schools of South Carolina, from July 1st, 1935, to June 30th, 19340, and, in the adoption of the books, the State Board of Education, and its members, violated the law and transcended their authority, as given to them in Section 5289 of the Code of 1932, by changing 'more than 25% of the school books in use at the time of the above adoption'; that the contracts made by the State Board of Education with the publishers of the school books were without warrant and void, and imposed upon each of the respondents, as well as many other taxpayers and patrons of the free public schools of the State, an additional and uncalled for burden, in the matter of purchase of school books for their children."

Upon this petition, Hon. G. Duncan Bellinger, Judge of the Fifth Circuit, ordered the appellants to show cause before him why the prayer of the petition should not be granted.

The appellants demurred to the petition and filed a return thereto. Neither of these documents is included in the record. In the "Statement for Appeal," this is set out:

"In the answer and return, the appellants denied that the adoption made by them of the school books for use in the free public schools was illegal, and alleged that the same was legal.

"Many of the issues made by the pleadings, passed upon and decided by the Presiding Judge, are not involved in the appeal, and, for that reason are not here stated.

"The main issues to be determined in the appeal relate to questions of law, the construction of the statutory enactments, providing for the prescribing and enforcement of a course of study in the free public schools, the prescription and enforcing of the use of a uniform series of textbooks in such schools, and the powers and duties of the State Board of Education in matters of adopting books for such use, and the right to change books previously adopted."

Upon the pleadings and the evidence taken before him, Judge Bellinger made and filed his decree as of date June 25, 1935, in which he said, among other things: "Let it again be pointed out that this Court is not passing upon the validity of the contracts already made by the State Board of Education with publishers, for that question cannot be properly passed upon here, the publishers not being a party, but this order shall be operative insofar as it affects the right of the State Board of Education to enter into pending contracts."

He further ordered that "the temporary injunction herein granted be made permanent, insofar as consistent with this opinion."

From this decree the defendants appeal upon several exceptions. In their argument, counsel for appellants say: "The ten exceptions of the appellants need not be discussed separately. All of them relate to the authority, powers and duties of the State Board of Education in the matter of prescribing a course of study, the adoption of textbooks, and the con-

tracting for publishing of such textbooks for use in the free public schools. The authority, powers and duties of that board are more particularly referred to in Section 5289 of the Code, but there are provisions in the Constitution of the State and statutory enactments, other than those contained in Section 5289, which are proper to be considered in the determination of the questions involved."

So much of the evidence taken at the hearing as is pertinent to the issues involved is thus stated in the record:

"1. The adoption of textbooks, which is challenged, took place in September, 1934. That adoption applied to the first, second and third grades, called the primary grades, or first group, and the fourth, fifth and sixth and seventh grades, called the elementary grades, or the second group. There is no question as to any action of the State Board of Education in giving proper notices of their meetings for the adoption, or of proper advertisement for competitive bids. No bad faith, or improper conduct is charged against the State Board of Education, or any of its members, or against any of the publishers of textbooks adopted by the Board.

"2. The extra expense to the petitioner, J. A. Frier, a patron of the public schools and a taxpayer of the State, because of the change in textbooks in the school year 1935-1936, will be $8.77. The extra amount to be paid by the school patrons of the State generally is altogether conjectural, but it will likely amount to several thousand dollars. There is always, necessarily, extra expense to the patrons of the public schools when a new adoption of textbooks is made.

"3. In the 1934 adoption, and the course of study prescribed, the State Board of Education provided that many of the books, adopted at the previous adoption of 1927, could be continued in use, until completed by the pupils, so as to make the adoption a gradual one, and to save expense to the pupils and patrons. But the respondents do not agree that the plan of the State Board will result in saving of expenses to the patrons and pupils.

"4. In the adoption of 1934, the State Board of Education acted upon the advice of the Attorney General, that in the adoption of textbooks 'substitutions' or 'replacements,' necessary because of the failure or refusal of publishers of textbooks adopted in the previous adoption, that of 1927, to reoffer the books for adoption, or to contract for their use, could not be counted against the State Board of Education in figuring the percentage of twenty-five per cent. of 'exchangeable' books, as provided for in the statute relating to the adoption of textbooks, and the prescribing of a course of study in the public schools. In other words that the State Board could change twenty-five per cent. of the 'exchangeable' books in the primary grades, and twenty-five per cent. of the 'exchangeable' books in the elementary grades, and that the Board had the right to substitute or replace books not reoffered by the publishers for adoption. In the previous adoption, that of 1927, the Board had similar advice from the Attorney General, which was followed in the adoption of that year.

"5. At the 1935 Session of the General Assembly, the State Board of Education, at the request of the Committee on Education of the House of Representatives, made a full and complete report to that Committee as to the adoption of 1934, now under review. It informed the General Assembly, through that Committee, of the changes made in the exchangeable textbooks at the 1934 adoption, as compared with the 1927 adoption, of the replacements or substitutions made in such textbooks, and advised the General Assembly as to the construction of the statute on the part of the Attorney General, and that the Board had adopted and followed that construction.

"6. Of the forty-five 'exchangeable' volumes, twenty-six were not offered by the publishers for readoption, for the reason that they had become obsolete, were not fitted for use in the public schools, and the publishers did not care to continue their publication.

"7. The table shows the number of 'exchangeable' books by grades and groups of the 1927 adoption, the changes actually made by the Board, the changes or replacements made, because books were not offered for readoption, which changes respondents contend had to be counted in the percentage, the books readopted by the Board of books offered for readoption, and the books dropped from the course of study."

It is conceded that there are some slight inaccuracies of statement contained in the circuit decree, but it is agreed by appellants that they are of minor importance and do not affect the determination of the case.

The questions for determination are thus stated by appellants' counsel, from their point of view:

"1. The proper construction of the provisions of the school laws, relating to the prescribing of a course of study, and the adoption and enforcement of a uniform series of textbooks for use in public schools by the State Board of Education.

"2. The propriety of enjoining the State Board of Education from entering into proposed contracts with publishers of textbooks, for the use of certain books in the free public schools, in the absence of a showing that the proposed contracts are illegal, or that they will cause unnecessary expense to those who complain of the proposed contracts."

Counsel for appellants have submitted an elaborate and interesting brief in which they review the constitutional provisions and the statutory enactments relating to the history of the "school book issue" from the time of the adoption of the Constitution of 1895 and even before then, and their contention is that all of the provisions and enactments are to be considered in connection with Section 5289 of the Code in order to ascertain the intent of the Legislature in enacting the law. In support of this contention, they argue earnestly and cite many authorities to show the rule for the construction of statutes.

■ It is all most interesting, but in our judgment it is ineffective in determining the intent of the Legislature in the section of the Code now under review. This elaborate argument would be pertinent if there were any ambiguity in Section 5289.

"One of the most elementary rules for the interpretation of statutes is that the intention of the Legislature must be gathered from a literal intepretation of the language of the statute where it is plain and unambiguous. * * * When the meaning of words is so plain and obvious, the courts cannot speculate on the intention. To do so would be an assumption of legislative power." *State v. Jones,* 99 S. C., 218, 82 S. E., 1048, also, *State v. Hagood,* 13 S.C., 46; *Lytle v. Southern Ry.-Carolina Division,* 171 S. C., 221, 171 S. E., 42, 90 A. L. R., 915; *Ex Parte Savannah River Electric Co.,* 169 S. C., 198, 168 S. E., 554.

■ We find no ambiguity in the language of the applicable provisions of Section 5289. We reproduce them here:

*"Powers of State Board of Education.*—The State Board of Education shall have power: (1) To adopt rules and regulations not inconsistent with the laws of the State for its own government and for the government of the free public schools. (2) To prescribe and enforce rules for the examination of teachers. (3) To prescribe a standard of proficiency before county boards of education, which will entitle persons examined by such board to certificates as teachers. (4) To prescribe and enforce the course of study in the free public schools. (5) To prescribe and enforce the use of a uniform series of textbooks in the free public schools of the State; to enter into an agreement with the publishers of the books prescribed, fixing the time of prescription and the price above which the books shall not be retailed during the period of prescription and a rate of discount at not less than which the books shall be furnished by the retail dealers in this State; to require the publishers, in

the discretion of the board, to establish in each county one or more depositories of their books within the State, at such place or places as the board may designate, and where such books may be obtained without delay; and to exact of the publisher, a bond in the sum of not more than five thousand ($5,000.00) dollars, conditioned for the faithful performance of the agreement, and with a penalty of twenty-five ($25.00) dollars for each violation of the agreement, the form and execution of the bond to be approved by the Attorney General of the State, which agreement and bond shall be deposited with the State Treasurer, all recoveries thereon to go into the State Treasury for school purposes: Provided, That the State Board of Education shall not have power without permission of the General Assembly of the State to change a textbook within five years from the date of its adoption except for violation of the agreement entered into by its publisher with the State Board of Education, for which cause it may be changed by said board: and, Provided, further, That not more than twenty-five per cent of the exchangeable books used in the first, second and third grades, and not more than twenty-five per cent of the exchangeable books used in the fourth, fifth, sixth and seventh grades, and not more than twenty-five per cent of the exchangeable books used in the high school grades, as designated by the State Board of Education, shall be changed at any one adoption. Every change of the textbook adopted for any subject or grade shall be based on at least one reason to be assigned for the change by the State Board of Education in writing, and the vote of the board making such change shall be recorded in the minutes of said board and shall be taken on a roll call, said roll call to be recorded in said minutes. The meetings of the State Board of Education at which textbooks may be adopted shall be public; and it shall be unlawful for any teacher drawing public school money to use any book not prescribed by the State Board of Education. (6) To grant State

teachers' certificate and revoke them for immoral or unprofessional conduct, profanity or evident unfitness for teaching. (7) To review on appeal an order revoking a county certificate. (8) To award scholarships created by the General Assembly in the institutions of learning in whole or in part supported by the State: Provided, That a change from a co-basal constitutes a change within the meaning of this section: Provided, further, That the change of the textbooks adopted under the provisions of this section shall be and refer to the volume of such books and not to the title: Provided, further, That the State Board of Education is hereby prohibited from making any changes in the textbooks now used in the free public schools of this State until the year 1933, at which time an adoption may be made in accordance with the existing law only as to high school books and that during the year 1934, the State Board of Education may make an adoption, as now provided by law, for grammar school books. The intent and purpose of this amendment is, that the contracts now existing shall be extended to 1933 as to high school books and shall be extended to 1934 as to grammar school books.

"Provided, further, That if the publishers now furnishing textbooks in use under contract will contract to furnish same for the period hereinabove set forth, at the same or lower prices now in effect, then the State Board of Education shall extend the present contracts for the period hereinabove set forth, and that the latest editions of various textbooks now in use shall be furnished under said contracts at no advance in price.

"Provided, further, That any violation hereof shall subject the offenders to expulsion from the board and make nugatory and void any contract made in violation hereof.

"Provided, further, That all contracts to be entered into under the provisions of this section must be approved by the Attorney General; and the Attorney General shall require each contractor to file a sufficient bond, to be approved by the

Attorney General, to protect the interest of the State in case the contract is broken in any way. That the contracts shall provide that if any person, firm or corporation, which furnishes books to the State, sell the same book, or books, or cause same to be sold, to any other person, firm, corporation or State or board for a price less than that which the State of South Carolina has a contract for, then such less price shall automatically become the contract price for said book or books in this State, and that the contents of the book shall be considered and not the title in investigating the prices herein. The State Board of Education is charged with making the necessary investigations as to the prices of said book or books sold to other persons, firms, corporations, states or boards.

"Hereafter when the State Board of Education shall adopt new textbooks for the use in the public schools of this State such books shall not be used until the expiration of one year after the adoption."

The positive inhibition of the section is "that not more than twenty-five per cent of the exchangeable books used in the first, second and third grades, and not more than twenty-five per cent of the exchangeable books used in the fourth, fifth, sixth and seventh grades, and not more than twenty-five per cent of the exchangeable books used in the high school grades, as designated by the State Board of Education, shall be changed at any one adoption."

It is a matter of common knowledge that for years much dissatisfaction existed in the State because of the expense inflicted upon the parents of school children because of the frequent changes in school books. It was this constant and almost universal complaint which undoubtedly led to the passage of the Act of Feb. 28, 1914 (28 St. at Large, 450), by which Act it was provided that not more than 50 per cent. of the exchangeable books used in certain grades should be changed at any one adoption. It would seem that this enactment did not silence the complaints. The Act of March

19, 1923 (33 St. at Large, 147), reduced the percentage of exchangeable books allowed to be changed to 25 per cent. and so it stands today. There is no uncertainty about it. The language is plain on its face. The State Board of Education shall not change more than 25 per cent. of the exchangeable books in the named grades at any one adoption.

It is not contended that the board did not understand the statute. It is not denied that the board did, at the 1934 adoption, change more than 25 per cent. of the books in the specified grades. It is true that it is excepted that the percentage of change is not exactly that stated in the Circuit decree, but it is not denied that the percentage of change adopted is far in excess of 25 per cent.

The appellants seek to justify their actions in the premises in several ways. They say they have not "changed" any books; that they have "substituted" some books for those which could not be had because they were now obsolete and the publishers had ceased to publish them. The distinction sought to be made in meaning between "change" and "substitute" is too subtle to win our approval. If by failing or refusing to publish textbooks which they are aware have been adopted by the State Board of Education, under the law, for use in the free public schools, the publishers can thus compel the State Board of Education to "substitute" such books as they choose to publish and offer the board, they are more potent than the Legislature and can set at naught the provisions of the law. When the State Board is confronted by such a situation it is its plain duty to submit the matter to the Legislature, and until it acts, the board cannot act, except in compliance with the plain mandate of the law.

It is further contended by appellants that this matter was reported to the committee on education of the House of Representatives at the 1935 session of the General Assembly by the State Board of Education. It appears from Volume 2 of the House Journal, to which

both parties have appealed and cited, that the majority of the committee on education disapproved the construction of the law given it by the State Board. Appellants contend that, inasmuch as the General Assembly took no action to change the law, it was satisfied with the construction of the State Board. The contention is not tenable. The majority of the committee plainly made known its disapproval of the construction of the law by the State Board, and it is fair to assume that the board would regulate its conduct by the expressed opinion of the committee. If the board and the minority of the committee were not pleased with the action of the majority of the committee, it was for them to take action to amend the law.

We may say, as did the Circuit Judge, that the validity of the contracts already made is not now being considered. We are passing only upon the question of the contracts proposed to be entered into.

It is urged by the appellants that the Circuit Judge ■ should not have granted the injunction even if he was right in his construction of the law. Of course they do not concede that he was correct.

We do not concur in this view. The statute gives him no discretion in the matter. When he found that the proposed contracts contravened the express provisions of the law, it was his duty to enjoin the execution of them.

It is argued for appellants that the Circuit Judge erred in saying that the State Board should have submitted the matter to the Legislature for its instruction and action; the contention being that there is nothing in the law which compels the State Board of Education to submit to the Legislature what books it shall adopt. That is true, but it is not the matter which the Circuit Judge held should be submitted to the General Assembly. He held that, when the State Board of Education found that it could not make its contracts without running counter to the provisions of the Act of the

General Assembly, it should have applied to the legislative body for the necessary legislative aid.

If the State Board of Education could disregard this plain inhibition of the law, it could "change" or "substitute" 100 per cent. of the books adopted by it at its own suggestion.

The order of injunction appealed from is affirmed, and the appeal dismissed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER, BAKER and FISHBURNE concur.